RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ROGER L. SANDERS and ROGER L. THACKER
(10-3821); UNITED STATES OF AMERICA (10-
3818),

              *Plaintiffs-Appellants*,

      *v.*

ALLISON ENGINE COMPANY, INC., GENERAL
TOOL CO., SOUTHERN OHIO FABRICATORS,
INC., GENERAL MOTORS CORPORATION,

              *Defendants-Appellees*.

Nos. 10-3818/3821

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
Nos. 1:99-cv-923; 1:95-cv-970—Thomas M. Rose, District Judge.

Argued: June 5, 2012

Decided and Filed:   November 2, 2012[*]

Before:  BATCHELDER, Chief Judge; GIBBONS, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Thomas M. Bondy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant in 10-3818.   James B. Helmer, Jr., HELMER, MARTINS, RICE & POPHAM, CO., L.P.A., Cincinnati, Ohio, for Appellants in 10-3821.  Glenn V. Whitaker, VORYS, SATER, SEYMOUR & PEASE, LLP, Cincinnati, Ohio, for Appellees in 10-3818 and 10-3821. **ON BRIEF:** Douglas N. Letter, Irene M. Solet, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant in 10-3818.  James B. Helmer, Jr., Paul B. Martins, Robert M. Rice, Erin M. Campbell, HELMER, MARTINS, RICE & POPHAM, CO., L.P.A., Cincinnati, Ohio, for Appellants in 10-3821.  Glenn V. Whitaker, Victor A. Walton, Jr., Michael J. Bronson, Mary C. Henkel, VORYS, SATER, SEYMOUR & PEASE, LLP, Cincinnati, Ohio, Gregory a. Harrison, DINSMORE & SHOHL, L.L.P., Cincinnati, Ohio, William

---

[*]This decision was originally issued as an "unpublished decision" filed on November 2, 2012. The court has now designated the opinion as one recommended for full-text publication.

A. Posey, KEATING, MUETHING & KLEKAMP, PLL, Cincinnati, Ohio, for Appellees in 10-3818 and 10-3821.

————————————

## OPINION

————————————

JULIA SMITH GIBBONS, CIRCUIT JUDGE.  This case arises out of a *qui tam* action pursuant to the False Claims Act ("FCA").  Following this panel's prior decision in this case—finding that liability under the FCA did not require presentment of a false claim to the government—the defendant contractors and subcontractors appealed to the Supreme Court.  The Supreme Court reversed, finding that 31 U.S.C. § 3729(a)(2) liability required presentment of the claim to the government.  *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 668–69 (2008).  In May 2009, Congress passed the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which amended several anti-fraud statutes, including the FCA.  Congress specifically amended the liability standards then set forth in § 3729(a)(2) of the FCA in order to remove the presentment requirement imposed by the Supreme Court's decision.  It also included specific retroactivity language in § 4(f)(1) of FERA indicating that the changes to § 3729(a)(2), now codified at § 3729(a)(1)(B), "shall take effect as if enacted on June 7, 2008, and apply to all *claims* under the False Claims Act . . . that are pending on or after that date."  Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, §4(f)(1), 123 Stat. 1617, 1625 (emphasis added).  After FERA was passed, the defendants in this case filed a motion to preclude retroactive application of the amended provisions in § 3729, which the district court granted, finding that the retroactive language in FERA did not apply to this action, because no *claim* was pending in June 2008 and further that retroactive application of the amendments was prohibited under the *Ex Post Facto* Clause.  The question of retroactive application of the amendments to § 3729(a)(2) was then certified for interlocutory appeal.  For the reasons that follow, we reverse the district court's order precluding retroactive application of 31 U.S.C. § 3729(a)(1)(B) and remand for further proceedings.

I.

In 1995, Roger L. Sanders and Roger L. Thacker, relators, brought a *qui tam* action pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, alleging that several defendant subcontractors engaged in fraud in connection with the construction of generator sets used in United States Navy Arleigh-Burke-class Guided Missile Destroyers. *Allison Engine Co.*, 553 U.S. at 665–67.   The case was then consolidated with a separate FCA suit brought by the relators regarding the same alleged fraudulent conduct.  The first action, referred to as the "Quality Case," alleged that the defendants submitted claims for payment related to the construction of the generator sets despite knowing that the generator sets failed to conform to contract specifications and Navy regulations.  The second action, referred to as the "Pricing Case," involved allegations that the defendants withheld cost and pricing data during their negotiations with the government's agent in violation of the Truth in Negotiations Act and the FCA. Only the Quality Case is at issue in this appeal.  The Quality Case was tried before a jury, and at the close of the relators' case, the defendants filed a motion for judgment as a matter of law on the grounds that the relators failed to produce evidence of a false claim presented to the Navy—and that without proof of presentment no reasonable jury could find a violation of the FCA. *Id.* at  667.  The district court granted the motion on the grounds that proof of a false claim presented to the government was required to find a violation under § 3729 of the FCA.  *United States ex rel. Sanders v. Allison Engine Co.*, No. 1-:95-CV-970, 2005 WL 713569, at \*10–12 (S.D. Ohio, Mar. 11, 2005).

On appeal, this court held that there was no presentment requirement for liability to attach under § 3729(a)(2) or (3) and reversed the district court's grant of judgment as a matter of law in the Quality Case. *United States ex rel. Sanders v. Allison Engine Co.*, 471 F.3d 610, 613 (6th Cir. 2006).  The defendants appealed the decision to the Supreme Court, which vacated this court's decision and remanded. *Allison Engine Co.*, 553 U.S. at 673.

The Supreme Court found that for § 3729(a)(2) liability to attach, "a defendant must intend that the Government itself pay the claim." *Id.* at 669.  The Court noted that

this intent requirement did not mean that "proof that the defendant caused a false record or statement to be presented or submitted to the Government" was required; rather, liability could be established if it was proven that the "defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" *Id.* at 671.

On February 27, 2009, we remanded the case to the district court for further proceedings consistent with the Supreme Court's opinion. On May 20, 2009, Congress passed FERA, Pub. L. No. 111-21, 123 Stat. 1617 (2009), which amended portions of the FCA and other anti-fraud statutes. Included among the amendments was a change to the standard of liability imposed under the FCA. Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621–25. Section 4 of FERA is titled "Clarifications to the False Claims Act to Reflect the Original Intent of the Law." *Id.* Although the FCA previously imposed liability for "knowingly mak[ing] . . . a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2) (2006), the amended liability standard imposes liability for "knowingly mak[ing] . . . a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2012). This section of FERA was intended to "clarify and correct erroneous interpretations of the law that were decided in *Allison Engine Co. . . . .*" S. Rep. No. 111-10, at 10.

Section 4 of FERA provides that the FCA amendments apply to conduct occurring on or after the date of enactment (May 20, 2009).[1] FERA § 4(f). FERA

---

[1]In its entirety section 4(f) of FERA provides:

(f) Effective Date and Application.-- The amendments made by this section shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment, except that–

　　(1) subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date; and

　　(2) section 3731(b) of title 31, as amended by subsection (b); section 3733, of title 31, as amended by subsection (c); and section 3732 of title 31, as amended by subsection (e); shall apply to cases pending on the date of enactment.

contains, however, two exceptions where a different effective date applies to the FCA amendments.  Pursuant to §4(f)(1), the amended liability provision "shall take effect as if enacted on June 7, 2008,[2] and apply to all *claims* under the False Claims Act . . . that are pending on or after that date."  FERA § 4(f)(1) (emphasis added).  Under the second exception, provisions governing how new allegations filed by the United States as intervenor relate back to the date of the relator's complaint as well as other amendments to various provisions of the FCA, "apply to *cases* pending on the date of enactment." FERA § 4(f)(2) (emphasis added).

On July 21, 2009, the defendants filed a motion to preclude the retroactive application of the amended FCA liability standard set forth in 31 U.S.C. § 3729(a)(1)(B) or, in the alternative, to declare unconstitutional FERA § 4(f).  The defendants noted that in contrast to the majority of FCA amendments, which apply prospectively, FERA's expansion of liability under § 3729(a)(1) was made retroactive to two days before the Supreme Court's decision in *Allison Engine* and suggested that Congress intended to overturn the decision and to create liability for conduct not forbidden under the prior version of the FCA.  The defendants argued that the *Ex Post Facto* Clause and their Fifth Amendment due process rights would be violated by retroactive application of § 3729(a)(1)(B).

The relators filed a memorandum in opposition to defendants' motion to preclude and argued that the retroactive application of 31 U.S.C. § 3729(a)(1)(B) would not violate the *Ex Post Facto* Clause.  The United States filed a statement of interest in response to the motion to preclude and made three primary arguments: (1) the district court should observe the principle of constitutional avoidance and avoid reaching the constitutional challenges raised by defendants by finding that the amended liability provision would not change the outcome of the case, (2) application of the new liability provision would not affect the defendants' expectations and would not be retroactive in

---

Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1625 (2009).

[2]June 7, 2008, is two days prior to the Supreme Court's decision in *Allison Engine Co.*

the relevant sense because the Supreme Court's *Allison Engine* decision did not exist when the defendants acted, and (3) application of § 3729(a)(1)(B) would not violate the *Ex Post Facto* Clause or the Due Process Clause because the FCA is a remedial statute and because the congressional decision to make amendments to the FCA liability standard served a rational purpose.

On October 27, 2009, the district court granted the defendant's motion to preclude retroactive application. *United States ex rel. Sanders v. Allison Engine Co.*, 667 F. Supp. 2d 747, 758 (S.D. Ohio 2009). The district court found that the plain language of § 4(f)(1) of FERA ("the retroactivity clause") prevented retroactive application of 31 U.S.C. § 3729(a)(1)(B) because "a plain reading of the retroactivity language reveals that the relevant change is applicable to 'claims' and not to 'cases.'" *Id.* at 752. The district court noted that the legislative history supported this reading because the "Senate Report's explanation of FERA's amendments to the FCA uses 'claims' to refer to a defendant's request for payment and 'cases' when discussing civil actions for FCA violations." *Id.* (citing S. Rep. No. 111-10 (2009)). Further, the court found that, read as a whole, § 4(f) of FERA further buttressed the conclusion that Congress did not intend "claims" in § 4(f)(1) to mean "cases" because § 4(f)(2) specifically states that "'section 3731(b) of title 31, as amended . . . shall apply to cases pending on the date of enactment.'" *Id.* The district court found that Congress's specific use of "cases" in the subsection directly following § 4(f)(1) indicated that Congress could have used the term but chose not to do so in § 4(f)(1). *Id.* The district court further found that even if the retroactivity clause meant that the amended liability provision applied to the case pending before it, that application would violate the *Ex Post Facto* Clause because Congress intended to impose punishment when it amended the FCA. *Id.* at 752–56. The district court found especially persuasive the comments by FERA sponsors who referred to the need to "punish" those who defraud the government and the fact that the Supreme Court has found that the FCA treble damages multiplier is "essentially punitive in nature." *Id.* at 754–55. Finally, the district court found that even if Congress had not intended for the FCA to punish violators, the FERA

amendment altering the liability standard would still be unconstitutional because it is "punitive in purpose or effect." *Id.* at 756–58.

Following the district court's decision, the United States filed a motion to intervene. The United States and the relators also filed a motion to certify the district court's entry and order precluding retroactive application for interlocutory appeal. The district court granted the motion and amended its prior entry and order to certify the decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This court granted the petitions for interlocutory appeal, finding that the order certified for interlocutory appeal presented "a controlling question of law . . . because which version of the statute applies will determine the standard of liability."

## II.

On interlocutory appeal, our review is limited to "consider[ing] only pure questions of law." *Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 285 (6th Cir. 2010). Statutory interpretation and challenges to the constitutionality of a statute present questions of law subject to *de novo* review. *Ammex, Inc. v. United States*, 367 F.3d 530, 533 (6th Cir. 2004).

## III.

We must determine whether the new § 3729(a)(1)(B) applies to all civil actions under the FCA that were pending on June 7, 2008, including this case. If "claim" in § 4(f)(1) means a request or demand for payment, then § 3729(a)(1)(B) would not apply retroactively to this case because there were no claims pending in 2008 because the claims relevant to the generator sets were made and paid in the 1980s and 1990s. However, if "claim" means a civil action or case, then § 3729(a)(2) would apply because this case was pending in June 2008.

## A.

"The language of the statute itself is the starting point in statutory interpretation." *Deutsche Bank Nat'l Trust Co. v. Tucker*, 621 F.3d 460, 462 (6th Cir. 2010). Focusing

on the text of FERA § 4(f), it is clear that Congress made two exceptions to the general rule that the amendments to the FCA "shall apply to conduct on or after the date of enactment"—May 20, 2009. FERA § 4(f). Under the first exception, the amendments to the pre-FERA version of § 3729(a)(2) are to "take effect as if enacted on June 7, 2008, and apply to all *claims under the False Claims Act . . .* that are pending on or after [June 7, 2008]." FERA § 4(f)(1) (emphasis added). Pursuant to the second exception, the amendments to § 3731(b) "Intervention by the Government," § 3733 "Civil Investigative Demands," and § 3732 "False Claims Jurisdiction" are to "apply to *cases pending* on the date of enactment." FERA § 4(f)(2) (emphasis added). Thus, in adjoining provisions which specify the two exceptions to the general rule that the amendments apply prospectively, Congress referred to "claims" in defining one exception and "cases" in defining the second.

The Supreme Court has instructed that where a statute includes "particular language in one section . . . but omits it in another section of the same Act," it leads to the general presumption that the "disparate inclusion or exclusion" was done "intentionally and purposely." *Russello v. United States*, 464 U.S. 16, 23 (1983). Thus, the use of different terminology in adjoining sections suggests that Congress utilized the specific terms intentionally. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–63 (2006); *Kosak v. United States*, 465 U.S. 848, 862 (1984) (Stevens, J., dissenting) ("Absent persuasive evidence to the contrary, we should assume that when Congress uses different language in a series of similar provisions, it intends to express a different intention."). Under this logic, the meaning of "claim" is distinct from the meaning of "case"—and the former should not be conflated with the latter.

The strength of this argument is undermined, however, by the fact that § 4(f)(1) and § 4(f)(2) were drafted by different chambers of Congress at different times. *See* Matthew Titolo, *Retroactivity and the Fraud Enforcement and Recovery Act of 2009*, 86 Ind. L.J. 257, 298, 300 (2011); *cf. Lindh v. Murphy*, 521 U.S. 320, 330 (1997) ("The insertion of § 107(c) with its different treatments of the two chapters thus illustrates the familiar rule that negative implications raised by disparate provisions are strongest when

the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted."). What ultimately became FERA § 4(f)(1) originated in the Senate version of FERA from March 2009. S. 386, 111th Cong. § 4(b) (as reported in Senate, March 5, 2009). Section 4(f)(2) originated in an amendment to FERA made by the House on May 6, 2009, which was then accepted by the Senate. S. 386, 111th Cong. § 4(f) (House engrossed amendment, May 6, 2009); S. 386, 111th Cong. (as accepted by Senate, May 14, 2009). Because the two provisions governing exceptions to the general effective date of FERA's amendments to the FCA were not drafted simultaneously, the inference that a difference in language signifies a different intention on the part of Congress is weak, despite the general presumption that Congress deliberately chose the difference.

The general presumption that "identical words used in different parts of the same act are intended to have the same meaning," *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932), is "not rigid" and will "yield[] whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Id.* Further, the Supreme Court has given "a different reading to the same language—whether appearing in separate statutes or in separate provisions of the same statute—if there is strong evidence that Congress did not intend the language to be used uniformly." *Smith v. City of Jackson*, 544 U.S. 228, 260–61 (2005) (O'Connor, J., concurring in the judgment) (listing cases); *see Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595–97 (2004). Thus, there is "no effectively irrebuttable presumption that the same defined term in different provisions of the same statute must be interpreted identically." *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 575–76 (2007) (internal quotation marks omitted).

In both the prior version of the FCA and the version amended by FERA, Section 3729 of the FCA contains a definition of "claim." As amended by FERA, "claim" is defined as "any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property . . . ."

31 U.S.C. § 3729(b)(2)(A) (2012).   The definition of "claim" is found within the "Definitions" subsection of § 3729.  That subsection specifically prefaces the definitions with "For purposes of this section." *Id.* § 3729(b).

The district court found that this definition and the absence of a definition for "case" in FERA and the FCA led to the conclusion that "a plain reading of the retroactivity language reveals that the relevant change is applicable to 'claims' and not to 'cases.'" *Sanders*, 667 F. Supp. 2d at 752. The defendants agree, pointing out that the technical definition of "claim" should be applied to the reference to "claims" in § 4(f)(1) because it is necessary to read the language in context.  The defendants point out that §4(f)(1) operates solely to define the retroactive application of the new § 3729(a)(1)(B). Thus, the two portions of the statutes (§ 3729 of the FCA and § 4(f)(1) of FERA) must necessarily be read in conjunction and in defendants' view it is appropriate to utilize the specific definition of "claim" provided in § 3729(b)(2)(A).

The relators and the United States also argue that reading the statutory language in context is necessary, but they reach the opposite conclusion, arguing that the reference to "claims" in § 4(f)(1) is in the context of the phrase "claims *under the False Claims Act*." FERA §4(f)(1) (emphasis added).  According to the United States, substituting the technical definition of "claim" into the phrase "claims under the False Claims Act" makes little sense because a request for payment is never effectively made under the FCA.[3]   Instead, the FCA (and its liability standards) only apply after an allegedly fraudulent request for payment is made and a civil action pursuant to the FCA is filed. Moreover, if the specific definition of "claim" in § 3729 is applied to the use of the word in § 4(f)(1) of FERA, the substitution yields a somewhat nonsensical result.[4]

---

[3]The United States notes that the only situation under the FCA that might implicate a request for payment would be after a successful *qui tam* suit is brought and the government receives monetary penalties and damages. (United States Appellant's Br. at 18–19.)  The government would then be required to pay the relator his or her statutory share of the award, although the relator would still not need to submit a request for payment.  31 U.S.C. § 3730(d).

[4]Inserting the definition of "claim" from § 3729 into § 4(f)(1) would result in the following: subparagraph (B) of section 3729(a)(1) of title 31 . . . as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all *request[s] or demand[s], whether under contract or otherwise, for money or property* . . . under the False Claims Act . . . that are pending on or after that date. *See* FERA

The relators further argue that the word "claim" should be given its natural or ordinary meaning—here they argue the ordinary meaning of "claim" suggests a claim for relief or cause of action, citing Black's Law Dictionary and the use of the term in the Federal Rules of Civil Procedure. Although statutory language is generally to be given its natural or ordinary meaning, when a term is given a statutory definition or used as a term of art, that definition "control[s] the meaning of statutory words . . . in the usual case." *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949). However, as noted above, there is no irrebuttable presumption of uniform usage. *See Gen. Dynamics*, 540 U.S. at 595–97. As a result, a court should not presume that a term defined by statute carries the same meaning every time it is used in a statute. *Envtl. Def.*, 549 U.S. at 574 ("A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies."). Thus, "[c]ontext counts." *Id.* at 576.

Considering all the arguments, we conclude that it is not appropriate to import the technical definition of "claim" into § 4(f)(1) of FERA and that the retroactivity clause embodies the situation where the presumption of uniform usage has been rebutted and the natural or ordinary meaning of claim should be used for purposes of interpreting § 4(f)(1).[5]

The conclusion that the specific definition of "claim" from § 3729(b) should not be imported into § 4(f)(1) also derives support from the use of the term "claim" in other sections of the FCA and the location of the retroactivity language at issue in the amended version of the FCA. Although the FCA often uses the term "action" to refer

---

§ 4(f)(1); 31 U.S.C. § 3729(b)(2)(A) (2012) (emphasis added to inserted definitional language). This insertion, which juxtaposes the definition normally given to a request to the government for payment with the language "under the False Claims Act," a statutory remedy pursued after an allegedly false claim is made, demonstrates the misfit between the definition and its placement in § 4(f)(1).

[5]Indeed, a recent article on this question of statutory interpretation has proposed this same conclusion: "[t]he fact that section 4(f)(1) embeds *claims* in the phrase 'claims [] under the False Claims Act,' coupled with the frequent use of *claims* as a synonym for *cases*, both in FERA and in general legal usage, reveals that claims is not being used in a technical way in the retroactivity clause." Matthew Titolo, *Retroactivity and the Fraud Enforcement and Recovery Act of 2009*, 86 Ind. L.J. 257, 289 (2011) (emphases added).

to a *qui tam* case or a civil action brought by the United States under the FCA, the statute also contains references to "claim/s" that clearly refer to and invoke the same concept of a civil action or legal claim, and not a request for payment. For example, § 3730(c)(5) states that the government "may elect to pursue its *claim* through any alternate remedy available . . . ." *Id.* (emphasis added). Section 3730 covers "Civil actions for false claims" and it is clear in context that the use of the word "claim" in subsection (c)(5) refers to the government's case against a violator of § 3729. Section 3731 also provides that when the government intervenes in a case, it may "file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the *claims* in which the Government is intervening." 31 U.S.C. § 3731(c) (2012) (emphasis added). As a final example, § 3732(b), entitled "*Claims* under state law," specifically grants district courts jurisdiction over any action brought under state law for the recovery of state or local government funds if the action arises from the same transaction as an action under § 3730 of the FCA. *Id.* (emphasis added). This use of the word "claims" in a generic sense to refer to "case" or "civil action" in other parts of the statute cautions against assuming that Congress meant a technical definition to apply when it used the term in § 4(f)(1).[6]

---

[6]The location of the retroactivity language in the FCA also sheds light on the propriety of relying on the technical definition. Section 4(f) of FERA is not codified in the text of § 3729, and is instead in the historical and statutory notes accompanying the section. *See* 31 U.S.C. § 3729 note ("Effective and Applicability Provisions"). The United States argues that this counsels against crediting the argument that the definitions in § 3729, which specifically apply for "purposes of this section," should be used to define terms used in § 4(f) or in the note to § 3729. (United States's Appellant's Br. at 20.) While this argument may be technically correct, it might elevate form over substance or relevant context. Although not codified in § 3729, it is clear that the retroactivity language in § 4(f) is vital to proper application of the amended FCA, and it is just as clear that § 4(f)(1)'s language specifically refers to § 3729.

B.

Although this Circuit has not yet definitively addressed the issue,[7] several courts have now addressed the question of whether the retroactivity language in FERA § 4(f)(1) applies to civil actions pending as of June 7, 2008. The parties both point to the decisions of other courts to support their interpretations of § 4(f)(1).

Thus far, the courts to address the issue directly are almost evenly split into those that conclude that "claims" refers to a claim for payment (this is referred to as the "majority view" by district courts in some opinions because somewhat more district courts have adopted this interpretation)[8] and those that conclude "claims" refers to cases.[9] The Second and Seventh Circuits have found that § 4(f)(1) makes the amendments to the former § 3729(a)(2) retroactive to FCA civil actions pending on June 7, 2008. *See United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011) (noting, arguably in dicta, that new § 3729(a)(1)(B) applies to cases pending on or after June 7, 2008); *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010) (applying new § 3729(a)(1)(B) to case filed in 2005 and pending as of June 2008), *rev'd on other grounds*, 131 S. Ct. 1885 (2011). In contrast,

---

[7]We have noted that "[i]t is unsettled . . . whether the retroactive effect mandated by Congress [in FERA § 4(f)] applies to 'claims' in the sense of demands made via litigation or 'claims' as defined by the FCA." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509 n.2 (6th Cir. 2010). *SNAPP*, however, did not decide the issue and instead presumed that the pre-FERA statutory language governed because the reasoning in the case was unaffected by the differing liability standards. *Id.* Similarly, in *United States v. United Techs. Corp.*, 626 F.3d 313, 321 (6th Cir. 2010), this court noted the amendments to the FCA liability standard set forth in § 3729(a)(2) were made retroactive to "claims pending in June 2008," but found that it "need not decide" which standard of liability under § 3729(a)(2) applied to the defendant (who had a civil action under the FCA pending as of June 2008 but did not have a "claim" as defined by the FCA pending) because the government could satisfy either.

[8]*See, e.g.*, *Foglia v. Renal Ventures Mgmt., LLC*, 830 F. Supp. 2d 8, 15–16 (D.N.J. 2011) (finding that § 3729(a)(1)(B) applies retroactively in place of unamended § 3792(a)(2) only when a defendant's false claims for payment were pending on or after June 7, 2008; *United States v. Edelstein*, No. 3:07-52, 2011 WL 4565860, at *8–9 (E.D. Ky. Sept. 29, 2011) (concluding that amendments to § 3729(a)(2) are inapplicable to case before it because they apply only to claims for money or payment that were pending on June 7, 2008; *United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 315 n.1 (D. Mass. 2011) (noting that courts have "almost uniformly interpreted 'claims' to mean claims for reimbursement" and declining to depart from the "majority view" (internal quotation marks omitted)).

[9]*See, e.g.*, *United States ex rel. Kappenman v. Compassionate Care Hospice of the Midwest*, *L.L.C.*, No. 09-4039-KES, 2012 WL 602315, at *3 (D.S.D. Feb. 23, 2012) (applying §3729(a)(1)(B) to *qui tam* suit brought in April 2009 (pre-FERA amendments)); *United States v. Phung*, No. CIV-09-772-L, 2011 WL 3584812, at *2 n.5 (W.D. Okla. Aug. 15, 2011) (applying amended version of § 3729(a)(2) to conduct that occurred in 2006 and 2007).

the Ninth and Eleventh Circuits have found that "claim" in § 4(f)(1) of FERA means a demand for payment. *See United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1051 n.1 (9th Cir. 2011) (noting simply that "[t]hese amendments do not apply retroactively to this case" and citing *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009)); *Hopper*, 588 F.3d at 1327 n.3 (applying definition of claim from § 3729(b)(2)(A) to retroactivity language in § 4(f)(1) of FERA and finding that although case was pending in June 2008, no claims were pending as of that date). The Fifth Circuit appears to have taken both positions. *Compare United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010) (concluding that the current § 3729(a)(1)(B) applies to complaint pending on June 7, 2008), *with Gonzalez v. Fresenius Med. Care N. Am.*, Nos. 10-50413, 10-51171, 2012 WL 3065314, at *3 & n.4 (5th Cir. July 30, 2012) (noting that the district court concluded that FERA's retroactivity provision did not apply because no "claims" were pending on June 7, 2008, and applying pre-amendment version of § 3729(a)). Unfortunately, the decisions resolve the issue without extended analysis. As a result, the available authority is of limited aid to our interpretation of the retroactivity language.

C.

The district court found that the Senate Report on FERA used "claims" to refer to a request for payment submitted by a defendant to the government and used "cases" to refer to civil actions for FCA violations. The district court concluded that this further supported its conclusion that "claims" as used in § 4(f)(1) does not refer to civil actions. The United States argues that the Senate Report is inconsistent in its use of the word "claim," using it to refer to alleged violations of the FCA in other portions of the report.

Overall, the Senate Report accompanying FERA uses the word "claim" to mean a request or demand for payment in its description of the amendments to the FCA. S. Rep. 111-10, at 10–12 (repeatedly referring to "false claim/s"). The Senate Report refers to "FCA cases" when it describes how "defendants across the country have cited *Allison Engine* in seeking dismissal of certain FCA cases." *Id.* at 11–12. However, in two instances the Senate Report also uses the term "claim" to mean a FCA *case*. *Id.* at 10,

14 n.10 (explaining that the presentment requirement from *Allison Engine* created a subcontractor loophole which "creates a new element in a *FCA claim* and a new defense for any subcontractor that are inconsistent with the purpose and language of the statute" and noting in a footnote that this court dismissed "a *claim* for false statements made by importers" (emphases added)).  Thus, in the two contexts where reference is made to a lawsuit brought pursuant to the FCA, the Senate Report adopts inconsistent terminology and uses both "FCA claim" and "FCA case."[10]  The district court opinion thus overstates to some degree the extent to which the Senate Report supports its conclusion.

### D.

In summary, we recognize that the strongest argument in favor of reading "claims" in § 4(f)(1) to mean a demand for payment is the structure of FERA itself. Congress used the word "cases" in § 4(f)(2) and gave the word "claims" a statutory definition for the purposes of § 3729.[11]  However, using the technical definition in context ("claims under the False Claims Act") provides a strained reading, and therefore it is not appropriate to import the statutory definition of "claim"—which applies for

---

[10] The Congressional Budget Office ("CBO") cost estimate for Senate Bill 386 (FERA) included in the Senate Report also refers to the ability of private individuals "to file *claims* against federal contractors" under the FCA, S. Rep. 111-10, at 16–17 (emphasis added), but we have not considered references to "claim" meaning "case" made by the CBO in the above discussion as such references were not made by the drafters of the bill.

[11] The defendants argue that the presumption against retroactivity further counsels in favor of adopting the district court's interpretation of the statute (finding that § 3729(a)(1)(B) only applies to claims for payment pending on or after June 7, 2008) because it is the narrower construction. (Appellees' Br. at 27–30.)  When considering whether a statute should be applied retroactively a court must first determine whether Congress "directed with the requisite clarity that the law be applied retrospectively." *I.N.S. v. St. Cyr*, 533 U.S. 289, 316 (2001).  "If the court finds that Congress clearly intended for the law to be applied retroactively, the analysis ends and the law may be applied as Congress clearly intended." *Mossaad v. Gonzales*, 244 F. App'x 701, 704 (6th Cir. 2007).  If the statute is silent on its retrospective effect, then a court must ask whether application of the statute to the objecting party "would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (internal quotation marks omitted).  "If such rights are affected, then courts must apply a presumption against retroactivity." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 584 (6th Cir. 2009).  Here, because Congress provided express language indicating that § 3729(a)(1)(B) was to apply retroactively, the parties do not dispute that Congress intended the amendments to the liability standard to have retroactive effect, and the only question is the scope of the retrospective effect intended, the application of the presumption against retroactivity is not implicated.  Although the defendants' approach to statutory interpretation has been advocated before, *see In re TMI*, 89 F.3d 1106, 1119 (3d Cir. 1996) (Sarokin, J., dissenting), we have not found any binding authority indicating the presumption against retroactivity should be used as a canon of construction when a statute is ambiguous as to the scope of retroactivity.

purposes of § 3729—into § 4(f). The fact that the two parts of § 4(f)'s exceptions to the effective date of FERA's amendments to the FCA were not drafted simultaneously reduces the strength of the structural argument. The use of "claims" elsewhere in the statute when the clear meaning is "cases" buttresses our conclusion. Consulting precedent and legislative history failed to further illuminate our analysis. Accordingly, we conclude that "claim" in § 4(f)(1) refers to a civil action or case. As a result, we must next consider whether retroactively applying § 3729(a)(1)(B)'s liability standard to cases pending on June 7, 2008, would violate the *Ex Post Facto* Clause.

IV.

"The Ex Post Facto Clause prohibits Congress from passing any law that (1) retroactively imposes punishment for an act that was not punishable when committed, (2) retroactively increases the punishment for a crime after its commission, or (3) deprives one charged with a crime of a defense that was available at the time the crime was committed." *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir. 2012); *see* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."). The *Ex Post Facto* Clause is only implicated by criminal statutes or acts intended to punish. *See Cutshall v. Sundquist*, 193 F.3d 466, 477 (6th Cir. 1999).

To determine if a "law constitutes retroactive punishment forbidden by the *Ex Post Facto* Clause," we must first "ascertain whether the legislature meant the statute to establish civil proceedings." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (internal quotation marks omitted). If we find "the intention of the legislature was to impose punishment, that ends the inquiry." *Id.* However, if the intent was to enact a civil and nonpunitive regulatory scheme, we "must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (internal quotation and editorial marks omitted). Deference is accorded to the legislature's stated intent such that "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 100 (1997) (quoting *United States v. Ward*, 448 U.S. 242, 249 (1980)); *Smith*, 538 U.S. at 92.

### A.  Whether the Intent Was to Impose Punishment

When assessing whether a statutory scheme is civil or criminal, we consider the statute's text and structure.  *Smith*, 538 U.S. at 92.  The manner of codification and the enforcement procedures established by a statutory scheme are also probative of legislative intent, although the location and labels of a statutory provision are not dispositive factors.  *Id.* at 94.

Consistent with an intent to establish a civil proceeding, the text of the FCA contains multiple references to "civil actions" and refers to liability for violations of § 3729 as "civil penalt[ies]."  *See* §§ 3729(a), 3730(a), (b).  The FCA is codified within title 31 of the United States Code, which is a civil, not criminal, title.  *See Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (finding state intent to create civil proceeding evidenced by inclusion of statutory provision in question within the probate code instead of the criminal code).  By labeling actions brought pursuant to the FCA "civil actions," Congress has thus expressed a preference for "one label or the other."  *Ward*, 448 U.S. at 248–49 (finding it significant that Congress "labeled the sanction authorized [in the statutory provision at issue] a 'civil penalty'" and finding additional significance in label given criminal penalties set forth in preceding subsection).  Further, Congress provided that in an action brought under § 3730 of the FCA by the United States, the government shall be held to the burden of proof common in civil litigation by requiring that it "prove all the essential elements of the cause of action . . . by a preponderance of the evidence," 31 U.S.C. § 3731(d) (2012), and also provided that FCA actions should be initiated by "[a] summons as required by the Federal Rules of Civil Procedure . . . ." *Id.* § 3732(a). The Senate Committee on the Judiciary report from the 1986 amendments to the FCA also contains evidence that supports the conclusion that members of Congress have consistently viewed the FCA as providing for civil proceedings.  The Senate Report noted that the FCA is a "civil remedy designed to make the Government whole for fraud losses," that the False Claims Reform Act was intended to "clarif[y] the burden of proof in civil false claims actions," and that current constructions of the FCA requiring the government to prove that a defendant had the specific intent to submit the false claim in question imposed a "standard . . . inappropriate in a civil remedy and . . . prohibit[ed] the

filing of many civil actions to recover taxpayer funds lost to fraud." S. Rep. No. 99-345, at 2, 6–7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267, 5271–72.

Against this evidence, the defendants emphasize the statements made by the original FCA sponsor and sponsors of the FCA amendments. The defendants argue that the statements reference an intent to punish and demonstrate that Congress did not intend to establish civil proceedings by passing and amending the FCA. The FCA was enacted in 1863, and its original sponsor has been quoted as stating that the purpose of the law was to punish and prevent fraud. *See United States v. Bornstein*, 423 U.S. 303, 309 n.5 (1976). In 2009, when the FERA amendments to the FCA were being considered, FERA's sponsors—senators Patrick Leahy and Chuck Grassley—made several statements that indicated that the FERA amendments would punish those who commit fraud against the government. The district court relied on many of these statements in concluding that FERA was intended to punish, *Sanders*, 667 F. Supp. 2d at 754–55, and the defendants argue that these statements "provide clear proof that Congress intended the FCA to impose punishment." However, many of these statements refer to combating fraud and to the FERA amendments *generally*. Because FERA included amendments to several criminal statutes as well as the FCA, *see* FERA § 2 (amending the false statements in mortgage applications statute (18 U.S.C. § 1014), the major fraud against the government statute (18 U.S.C. § 1031), the federal securities fraud statute (18 U.S.C. § 1348), and the federal money laundering statute (18 U.S.C. §§ 1956, 1957)), statements referencing punishing those engaging in fraud may easily be ascribed to the desire to punish under the criminal statutes amended by FERA.[12] For example, the district court stated that Senator Leahy "indicated that passage of the FERA would help law enforcement 'track down and *punish*' people." *Sanders*, 667 F. Supp. 2d at 754 (quoting 155 Cong. Rec. S4409 (daily ed. Apr. 20, 2009)). However, reading the statement in context reveals that Senator Leahy actually stated that as the economic crisis in 2008 worsened he had "called upon Federal law enforcement to track down and

---

[12]This is also true of statements by Senate Majority Leader Harry Reid in support of FERA cited by the defendants. (Appellees' Br. at 43.) Senator Reid referred to the need to punish those "responsible for the mortgage and corporate frauds," but he did not use the word "punish" when specifically referring to the strengthening amendments to the FCA, and referred to the FCA as "one of the most important civil tools . . . for rooting out fraud in Government." 155 Cong. Rec. S4725-07 (daily ed. Apr. 27, 2009).

punish those who were responsible for the corporate and mortgage frauds that helped make the economic downturn far worse." 155 Cong. Rec. S4408-02 (daily ed. Apr. 20, 2009) (statement of Sen. Leahy). This reference to punishing those responsible does not specifically refer to utilizing the FCA to effect punishment. And given the other anti-fraud statutes amended by FERA, which specifically involved mortgages and federal securities laws, the reference to punishment may more naturally be read as describing those criminal statutes instead of the FCA. Similarly, Senator Leahy's remark that without the FERA amendments Congress would be letting "fraud go[] unprosecuted and unpunished" is not specific to the FCA, and in context, Senator Leahy was referring to "[s]trengthening criminal *and civil* fraud enforcement." 155 Cong. Rec. S4604-04, 2009 WL 1098184, at *S4630 (daily ed. Apr. 23, 2009) (statement of Sen. Leahy) (emphasis added).

There is, however, a statement by Senator Grassley that does refer to the use of the FERA amendments to close legal loopholes created in the FCA, "thus ensuring that no fraud can go unpunished by simply navigating through the legal loopholes." 155 Cong. Rec. S4735-02 (daily ed. Apr. 27, 2009) (statement of Sen. Grassley). Further, during a 2002 hearing before the Senate Judiciary Committee, Senator Grassley asked then Attorney General John Ashcroft to confirm that he would "continue using the [FCA] to punish wrongdoing to the fullest extent of the law." 2002 WL 1722725 (F.D.C.H. July 25, 2002).

On balance, the sponsor and legislator statements do not indicate a clear intent to use the FCA to punish. While Senator Grassley appears to have referred to punishment in conjunction with references to the FCA, reading other statements in context suggests that any reference to punishment was not specifically made in reference to FERA's amendments to the FCA, particularly in light of the fact that FERA's other amendments were to criminal fraud statutes. Although we acknowledge that sponsors' statements may be relevant in interpreting statutes, the above statements, relied upon by the district court, are insufficient to outweigh the indicators of legislative intent that the text of the statute and the committee reports provide—indicators that suggest Congress

intended to implement civil proceedings for combating fraud and not to impose punishment.

## B.  Punitive in Purpose or Effect

Because we find that the Congress did not intend to impose punishment when it enacted the FCA and the FCA amendments, we must turn to the second step in the *Ex Post Facto* analysis and determine whether the statutory scheme is "so punitive either in purpose or effect as to negate [Congress's] intention to deem it civil." *Hendricks*, 521 U.S. at 361 (internal quotation marks omitted).  "[O]nly the clearest proof will suffice to . . . transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (internal quotation marks omitted).  In order to determine if the effects of the FCA are punitive in purpose or effect, we may consult as useful guideposts the factors set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), although the factors are not exhaustive or dispositive of the inquiry. *Smith*, 538 U.S. at 97.  The *Mendoza-Martinez* factors are:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . .

372 U.S. at 168–69.

The parties acknowledge that the *Mendoza-Martinez* factors do not uniformly weigh in favor  of finding that the statute is or is not punitive in purpose or effect.  We agree, but find that on balance the factors weigh in favor of finding a civil purpose or effect.

The first *Mendoza-Martinez* factor clearly favors the conclusion that the FCA has a civil purpose or effect.  The sanctions under the FCA do not involve an affirmative disability or restraint because they do not involve a "sanction approaching the infamous

punishment of imprisonment." *Cutshall*, 193 F.3d at 474 (internal quotation marks omitted); *see Hudson*, 522 U.S. at 104 (prohibiting petitioners from further participation in banking industry does not approach imprisonment). The defendants acknowledge that this factor does not support a finding of a punitive effect.

Under the second factor, we ask whether, from a historical perspective, the sanction has been viewed as punishment. Here, the sanction at issue is a monetary penalty.[13] *See* 31 U.S.C. § 3729(a) (2012) (providing for civil penalty of at least $5000 and not more than $10,000, adjusted for inflation, plus treble damages). A monetary penalty "is a sanction which has been recognized as enforcible by civil proceedings since the original revenue law of 1789" and has not "historically been viewed as punishment." *Hudson*, 522 U.S. at 104 (internal quotation and editorial marks omitted).

Moving to the third factor, a violation of the FCA contains an element of *scienter*[14] because it is premised on knowing conduct. 31 U.S.C. § 3729(a)(1), (b)(1). The United States argues that although liability under the FCA is premised on knowing conduct, it "falls short of the specific intent required for most crimes." (United States Reply Br. at 22.) The United States points out that "knowing" is defined broadly in the current § 3729(b)(1) as having actual knowledge, acting in deliberate ignorance of the truth or falsity of information, and acting in reckless disregard of the truth or falsity of

---

[13]The defendants argue that an analysis of this factor requires focusing more specifically on whether FCA sanctions have been regarded as punitive and not on the historical view of money penalties generally. (Appellees' Br. at 49–50.) Our review of cases applying the *Mendoza-Martinez* factors suggests that the analysis under this factor is often conducted at a fairly high level of generality, suggesting that the historical view of monetary penalties generally is appropriately considered at this point in the analysis. *See Smith*, 538 U.S. at 97–98 (comparing Alaska sex offender registration law's sanction (dissemination of information) to colonial punishments); *Hudson*, 522 U.S. at 104 (analyzing money penalties and occupational debarment sanctions imposed by the Office of the Comptroller of Currency by examining long held views of money penalties and debarment generally); *Cutshall*, 193 F.3d 475 (comparing Tennessee sex offender registration law's sanction (dissemination of information) to incarceration, incapacitation, and rehabilitation). However, to the extent that cases addressing the FCA's sanctions specifically should be considered, the Supreme Court has found that the FCA (before treble damages) was "remedial rather than punitive." *See Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 785 (2000) (citing *Bornstein*, 423 U.S. at 315). Further, the Supreme Court's view of treble damages under the FCA appears to have evolved somewhat, with the Court recently finding that such damages have compensatory aspects. *Compare Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003), *with Stevens*, 529 U.S. at 784 (2000) (finding such sanctions essentially punitive).

[14]"The term scienter means knowingly and is used to signify a defendant's guilty knowledge." *Cutshall*, 193 F.3d at 475 (internal quotation marks omitted).

information, and requires no specific intent to defraud. *Id.* § 3729(b)(1)(A)(i)–(iii), (B). Although the pre-FERA version of the FCA did not include a lowered intent standard (it did not premise liability on reckless conduct), the current version of the FCA can be violated upon either a finding of *scienter* ("knowingly") or recklessness. Because the current act can be violated by a lower *mens rea* than knowingly, *see* 31 U.S.C. § 3729(b)(1); *Cutshall*, 193 F.3d at 475, this factor does not weigh in favor of finding that the effect of the act is to punish.

The FCA does have some deterrent effects. *See United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 641 (6th Cir. 2002) ("The FCA has since become the primary means by which the Government combats and deters fraud."); *Bornstein*, 423 U.S. at 309 (noting principal goal of FCA when enacted was to stop massive frauds perpetrated by government contractors during Civil War). However, a deterrent purpose may serve both civil and criminal goals, and the mere presence of a deterrent purpose is not enough to render sanctions criminal. *See Hudson*, 522 U.S. at 105 (analyzing whether a sanction is criminal such that it would prevent trial under the Double Jeopardy Clause, and finding fact that sanction's deterrent purpose was insufficient to render it criminal because deterrence may support both civil and criminal goals); *Doe v. Bredesen*, 507 F.3d 998, 1005 (6th Cir. 2007). Thus, while the presence of deterrent effects might weigh in favor of finding a punitive effect, this factor is not dispositive.

The behavior which the FCA targets—the submission of a false claim to the government—is also a crime. 18 U.S.C. § 287. Thus, the fact that the FCA applies to behavior that is already criminal supports the conclusion that its effect is punitive, *see Mendoza-Martinez*, 372 U.S. at 168, although the impact of this factor on the analysis is potentially weakened by the fact that the FCA as amended by FERA appears to cover more conduct than that proscribed by the criminal statute.[15]

---

[15] The Supreme Court has noted that the reasoning behind this conclusion—that if the targeted behavior is already a crime it supports a finding of a punitive purpose or effect—is somewhat weakened by the fact that Congress may impose both a criminal and civil sanction regarding the same act or omission. *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 365 (1984). In *89 Firearms*, the Court noted that the forfeiture provision in question covered a broader range of conduct than a related criminal provision, which meant that the forfeiture provision was not limited solely to criminal conduct and was therefore not "co-extensive with the criminal penalty." *Id.* at 366. The overlap that did exist did not convince the Court that the forfeiture proceedings in question could not reasonably be viewed as civil

Another factor to consider in the analysis of whether the FCA sanctions are punitive in effect is whether the sanction may serve an alternative purpose. *Mendoza-Martinez*, 372 U.S. at 168–69. The Supreme Court has found "compensatory traits" in the FCA damages multiplier such that the treble damages available under the FCA "have a compensatory side, serving remedial purposes in addition to punitive objectives." *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003). The Court reached this conclusion based on several "facts about the FCA," including the facts that "some liability beyond the amount of the fraud is usually necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims," the FCA contains a *qui tam* feature which means that "as much as 30 percent of the Government's recovery" may be diverted to the relator and thus the "remaining double damages . . . provide elements of make-whole recovery beyond mere recoupment of the fraud," and the FCA does not provide for pre-judgment interest or consequential damages that often accompany recovery for fraud. *Id.* at 130–31 (internal quotation marks omitted). Given the Supreme Court's analysis of the FCA's treble damages provision, an alternative purpose may be assigned—that of compensating, or making whole, the government for its losses suffered due to fraud—and this factor weighs in favor of finding a civil purpose or effect.

Finally, despite the fact that an alternative purpose may be assigned to the FCA sanctions, if the treble damages available under the FCA appear excessive in relation to the alternative purpose assigned, that would weigh in favor of finding a punitive purpose or effect. *See Mendoza-Martinez*, 372 U.S. at 169. Sanctions available under the FCA consist of "a civil penalty of not less than $5,000 and not more than $10,000 [adjusted for inflation], plus 3 times the amount of damages which the Government sustains . . . ." 31 U.S.C. § 3729(a)(1) (2012). The district court found that because the treble damages

---

proceedings. *Id.* The criminal statute regarding false, fictitious or fraudulent claims against the government provides: "[w]hoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title." 18 U.S.C. § 287. This statute appears to proscribe less behavior than the amended version of § 3729; however, it is unclear that this difference in overlap is significant enough to suggest giving less weight to this factor in the analysis.

available under the FCA may lead to situations where the amount recoverable by the United States far exceeds the actual monetary loss sustained directly in the fraudulent scheme the sanctions under the FCA, especially the treble damages provision, appear excessive in relation to the alternative purpose of compensating the government and weigh in favor of finding a punitive effect.

The Supreme Court has found that "[t]he very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981). The Supreme Court has also found the treble damages provision of the FCA to be "essentially punitive in nature." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000). Viewed alone, this precedent suggests that the availability of treble damages supports a finding that the sanction is excessive in relation to the alternative purpose assigned (that of compensating the government for its losses). However, in *Chandler*, the Court seemed to soften its position with its finding that the FCA's treble damages provision actually possesses a compensatory side. *Chandler*, 538 U.S. at 130–32. In *Pacificare Health Systems, Inc. v. Book*, 538 U.S. 401, 405–06 (2003), the Supreme Court cited both *Stevens*'s and *Chandler*'s characterizations of the treble damages provision in the FCA, which suggests that the Court does not view the characterization of the treble damages provision set forth in *Stevens* as exclusively authoritative. *See id.* (explaining that the Court has "placed different statutory treble-damages provisions on different points along the spectrum between purely compensatory and strictly punitive."). Despite the fact that the treble damages provision of the FCA—dependent on the specific facts of a case—may allow for situations where the sanctions may appear excessive in relation to the alternative purpose assigned, *Chandler* suggests that this factor would at best only weakly favor a finding of punitive effect.

Overall, an analysis of the *Mendoza-Martinez* factors indicates that some aspects of the FCA weigh in favor of finding a punitive purpose or effect, while others weigh in favor of finding a civil purpose or effect. As the Supreme Court has noted, no one factor is dispositive in the analysis. *Smith*, 538 U.S. at 97. Here, the strongest factors in favor of finding a punitive effect are that the behavior punished by the FCA is already a crime,

the deterrent function of the FCA, and the availability of treble damages.  However, the fact that the FCA may have a deterrent effect is generally not enough alone to render a sanction punitive, and with *Chandler*, the Supreme Court appears to have softened its view of the role of treble damages under the FCA.  Given that "only the clearest proof" suffices to establish that a statute is punitive in purpose or effect at this stage of the analysis, *id.* at 92, we conclude that viewed as a whole, the *Mendoza-Martinez* factors fail to demonstrate a sufficiently punitive purpose or effect to "transform what has been denominated a civil penalty into a criminal penalty." *Id.* We therefore conclude that the retroactive application of the FCA does not violate the *Ex Post Facto* Clause's prohibition on retroactive punishments.

## V.

"The Due Process Clause . . . protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause may not suffice to warrant its retroactive application." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (internal quotation marks omitted).  Both prospective and retroactive aspects of legislation must meet the test of due process, "[b]ut that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984).  The defendants argue that FERA § 4(f) "does not rationally further a legitimate legislative purpose and deprives Defendants of the fair notice and repose guaranteed by the Due Process Clause . . . ." (Appellees' Br. at 53–54.)  To support their position, the defendants cite *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–86 (1996), where the Supreme Court found that a 500 to 1 ratio of punitive  to compensatory damages awarded in a state civil fraud action was grossly excessive in violation of the Due Process Clause.  But *Gore* does not indicate that the treble damages under the FCA that might attach to conduct reached by a retroactive application of § 3729(a)(1)(B) would implicate the same due process concerns.  Further, a rational legislative purpose may be identified here, where Congress made clear that it sought to

correct what it viewed as an erroneous interpretation of the FCA and passed the amendment "to reflect the original intent of the law." FERA § 4.

## VI.

For the foregoing reasons, we reverse the district court's judgment and remand for further proceedings.