

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-23-00175-CV

---

NATIONAL ASSOCIATION OF CHAIN DRUG STORES, INC., APPELLANT

V.

CECILE YOUNG, IN HER OFFICIAL CAPACITY AS THE EXECUTIVE
COMMISSIONER OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION
AND THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION, APPELLEES

---

On Appeal from the 98th District Court
Travis County, Texas
Trial Court No. D-1-GN-20-004599, Honorable Amy Clark Meachum, Presiding

---

June 12, 2024

## MEMORANDUM OPINION

Before DOSS and YARBROUGH and PIRTLE,[1] JJ.

By this appeal, we are asked to determine whether online updates to specific sections of the Texas Vendor Drug Program Pharmacy Provider Procedural Manual (Manual), which impact the method for determining the "usual and customary" price for Medicaid reimbursement to participating pharmacies constitute new rules which were

---

[1] Patrick A. Pirtle, Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

subject to the notice-and-comment rulemaking requirements of the Texas Administrative Procedure Act (APA).[2] Appellant, the National Association of Chain Drug Stores, Inc. (NACDS) filed suit against Appellees, Cecile Young, in her official capacity as the Executive Director of the Texas Health and Human Services Commission, and the Texas Health and Human Services Commission (collectively HHSC) seeking a declaratory judgment and an injunction to prohibit enforcement of the updates. HHSC asserted sovereign immunity and argued the updates were not new rules subject to the notice-and-comment period. Both sides filed motions for summary judgment and HHSC also filed a plea to the jurisdiction. The trial court denied NACDS's motion and granted HHSC's cross-motion but denied its plea to the jurisdiction.[3]

By two issues presented in its original brief and expounded on in its reply brief, NACDS contends the trial court erred in finding that (1) the updates to the Payment and Enrollment Sections of the Manual were not new rules which required compliance with the APA's notice-and-comment period and (2) Commissioner Young did not act *ultra vires.*[4] HHSC complains of the trial court's failure to grant its plea to the jurisdiction. We reverse and render.

---

[2] *See* TEX. GOV'T CODE ANN. §§ 2001.001–.903. All further references to "§" or "section" are to the Texas Government Code unless another code is designated.

[3] Originally appealed to the Third Court of Appeals, this appeal was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. TEX. GOV'T CODE ANN. § 73.001. Should a conflict exist between precedent of the Third Court of Appeals and this Court on any relevant issue, this appeal will be decided in accordance with the precedent of the transferor court. TEX. R. APP. P. 41.3.

[4] According to NACDS, Young acted *ultra vires* by failing to adopt rules that describe the process used to determine payment rates in violation of section 32.0281(a), (b) of the Human Resources Code, failing to adopt rules and standards governing the determination of fees, charges, and rates for Medicaid reimbursement in violation of section 531.021(d), (e) of the Government Code, and did not consult an advisory panel in adopting rules for the state prescription drug program in violation of section 531.302(c) of the Government Code.

## PLEA TO THE JURISDICTION AND ULTRA VIRES CLAIM

Which came first, the chicken or the egg? We must first dispense with HHSC's contention of error in the trial court's denial of its plea to the jurisdiction.[5] In doing so, it is difficult to discuss sovereign immunity without entwining the underlying challenge by NACDS to invalidate certain updates based on whether those updates are "rules" as defined by section 2001.003(6) of the APA.

Section 2001.038(a) of the APA waives sovereign immunity to the extent of creating a cause of action for declaratory relief regarding the validity of a rule if it is alleged the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff. *El Paso Hosp. Dist. v. HHSC*, 247 S.W.3d 709, 713 (Tex. 2008). "[T]he APA declaratory-judgment vehicle of section 2001.038 is a legislative grant of subject-matter jurisdiction." *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 720 (Tex. App.—Austin 2009, no pet.). But the challenged agency action constituting a rule must exist for a party to successfully invoke the trial court's subject matter jurisdiction under section 2001.038. *Muth v. Voe*, Nos. 03-22-00420-CV, 03-22-00587-CV, 2024 Tex. App. LEXIS 2257, at *71 (Tex. App.—Austin March 29, 2024, no pet. h.) (mem. op.). As discussed in detail, *infra*, we find the updates are new rules which should have been subjected to a notice-and-comment period under the APA and conclude NACDS properly invoked the trial court's jurisdiction to test the validity of those updates.

---

[5] NACDS contends HHSC waived any complaint regarding the denial of its plea to the jurisdiction by failing to file its own notice of appeal and HHSC conceded the point during oral argument. However, this Court must be satisfied the trial court had jurisdiction over the case.

The trial court's jurisdiction was likewise invoked by NACDS's allegation and proof that Young acted *ultra vires* by exceeding her authority in failing to comply with ministerial duties of the APA's rulemaking requirements.[6]  *See Teladoc*, *Inc. v. Tex. Med. Bd.*, 453 S.W.3d 606, 613 (Tex. App.—Austin 2014, pet. denied).  We conclude the trial court had subject matter jurisdiction and did not err in denying HHSC's plea to the jurisdiction.

## BACKGROUND

NACDS is a non-profit organization which represents pharmacies.  Medicaid is a health insurance program funded by federal and state governments which provides prescription drug benefits through its Vendor Drug Program to eligible individuals enrolled in Texas Medicaid.  Each individual pharmacy contracts with HHSC through a Pharmacy Enrollment Agreement (Agreement) authorizing each to dispense covered medications to Medicaid beneficiaries.  Per the Agreement, pharmacy providers must submit their "usual and customary" price for Medicaid reimbursement claims pursuant to program requirements defined in the Manual.  The Agreement requires pharmacies to provide information when submitting a claim for reimbursement that "[i]s true, complete and accurate."

Title 1, section 355.8541 of the Texas Administrative Code governs reimbursement to pharmacies on *the lesser of* certain price points, one of which is the usual and

---

[6] A suit against a state official may still proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires*.  *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021).  An *ultra vires* claim requires a plaintiff to allege, and ultimately prove, that a government official acted without legal authority or failed to perform a purely ministerial act.  *City of El Paso v. Henrich*, 284 S.W.3d 366, 372 (Tex. 2009).  The Texas Supreme Court has clarified what it means for an official to act "without legal authority."  *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016).  "[A] government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if [she] exceeds the bounds of [her] granted authority or if [her] acts conflict with the law itself."  *Id.*

4

customary price charged the general public. 1 TEX. ADMIN. CODE § 355.8541(a)(2). Since 1987, "usual and customary" price has been determined as follows:

(a) The usual and customary price is the price the provider *most frequently charges* the *general public* for the *same drug*. If the department cannot determine a most frequent price, the median price is used. Items that the provider must consider when determining the usual and customary price include the following:

(1) The term general public does not include any person whose prescriptions are paid by third-party payors, including health insurers, governmental entities, and the Texas Medical Assistance (Medicaid) Program.

(2) When a discount is given (including but not limited to cash rebate, monetary price discount, coupon value) or advertised for any segment of the general public, the discount must be included in the usual and customary price determination for Medicaid prescriptions if the Medicaid recipient would otherwise have qualified as a member of that same segment of the general public. Some providers give discounts to non-Medicaid customers based on requirements similar to those specified in subparagraphs (A) and (B) of this paragraph. Providers must not use the following types of requirements as reasons to disqualify Medicaid recipients as members of the same segment of the general public receiving the discount:

(A) possessing or presenting a special identification card or document, or making a verbal request for a discount;

(B) paying for the prescription by a particular method;

(b) If a provider utilizes one pricing policy for cash recipient and a different pricing policy for charge recipient, the lower of the two pricing policies is the provider's usual and customary price.

(c) The provider must keep adequate records showing how the usual and customary charge to the general public was determined according to the requirements as stated in this section. On request, the provider must disclose the records to the representatives of the following agencies: Texas Department of Health, Texas Attorney General's Medicaid Fraud Control Unit, and United States Department of Health and Human Services. The identification (name and address of non-Medicaid customers) may have

been removed from these records. *If the provider does not keep the records for the time period specified in his contract with the department, then the usual and customary price determination includes all discounts given or advertised* by the provider, regardless of whether the Medicaid recipient would or would not have qualified as a member of the general public receiving the discount.

1 TEX. ADMIN. CODE § 355.8544. (Emphasis added).


In May 2020, HHSC posted online updates to the Enrollment and Payment Sections of its Manual as follows:

**Enrollment**
**5.4 Pharmacy Discount Membership Programs**


Some pharmacies offer discount price clubs and other membership discount card programs. These programs typically have offered discount drug prices to all customers and given the discounted drug prices to the cash-paying customers who enrolled in the program and paid a nominal membership fee. The Usual and Customary (UAC) Price regulation (1 TAC Section 355.8544) does not exclude persons who pay a nominal membership fee from the general public. Therefore, pharmacy discount membership program prices constitute discounts given or advertised to the general public pursuant to 1 TAC Section 355.8544, as well as applicable federal law. *See, e.g., U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). Pharmacy discount membership program prices must be submitted as the UAC price (as previously indicated in the April 2008 edition of the RxUpdate newsletter former published by VDP . . .) unless the price would be greater than the most frequently charged price for the same drug.

**5.5 Third-Party Discount Plans**

Some pharmacies honor discount prices advertised to cash-paying customers by third-parties. Pharmacies may or may not contract with third-parties to adjudicate and administer these discounts.

Only people whose prescriptions are paid by third-party payors, such as health insurers, government entities and Texas Medicaid, are excluded from the general public in accordance with the UAC Price regulation (1 TAC Section 355.8544).

The involvement of a third party in offering, advertising, adjudicating, or administering the discount price a person pays does not remove the person

6

from the general public, and the third-party discount price must be included in the UAC price determination if honored by the pharmacy.

As with pharmacy discount membership programs, the requirement a person pay a nominal fee to enroll in the third-party's discount program does not remove the person from the general public or otherwise exempt the discount price from the UAC price determination. Some third-party discount plan prices are only offered to segments of the general public, such as discount plans for senior adults, employees/retirees of companies, etc. These discount prices must be included in the UAC price determination if the person would have qualified as a member of the same group or segment of the public, but-for the person's status as a Texas Medicaid beneficiary.

Refer to the "Usual and Customary" section of the **Payment** chapter of this manual for the definition of the UAC price.

**Payment**
**2.1 Usual and Customary**

The "Usual and Customary" (UAC) field (426-DQ) captures the amount requested for reimbursement. The usual and customary price is the price most frequently charged to the general public for the same drug.

\*\*\*

- Any person whose prescription is not paid for by a third-party payor, such as a health insurer, governmental entity, or Texas Medicaid, is a member of the general public.

- Pharmacies cannot exclude discount prices given to customers from its determination of the most frequently charged price for the same drug when reporting the UAC price to Texas Medicaid on a claim transaction. If a discount price is advertised for a drug then the discount price must be reported to Texas Medicaid as the UAC price for the same drug, unless the most frequently charged price is lower.

- "Opt-in" requirements to obtain discount prices (such as requiring the customer to possess or present a special identification card or to make a request for a discount) do not exclude a person from the general public for the purposes of determining the UAC price to report to Texas Medicaid.
\*\*\*

**2.1.1  Most Frequent Price Determination**

Texas HHS requires pharmacies to determine the price the pharmacy most frequently charges for the same drug, which means the pharmacy is

required to consider past-pricing data in actual transactions with uninsured customers to determine the most frequent (or mode) price for the same drug. The median price is used if a most frequent price cannot be determined.

A given drug is the same drug whether it is dispensed in a single unit or in multiple units, and Texas HHS requires a pharmacy to consider all transactions for the same drug as the Medicaid claim when determining the most frequent price, regardless of the quantity dispensed. To determine the most frequent price for the same drug across transactions with multiple different dispensed quantities, a pharmacy should:

1. Calculate the unit price for each uninsured transaction for the same drug.
2. Determine the most frequent unit price for the drug in its uninsured transactions.
3.  Multiply the most frequent unit price for the drug by the quantity of the same drug being dispensed in the Texas Medicaid claim.

The result will be the UAC price, (unless an advertised discount price for the same drug would be lower).

1 TAC Section 355.8544 is silent regarding the time period of actual transactions in past-pricing data before the Texas Medicaid claim a pharmacy should consider when determining the most frequent price. Accordingly, a reasonable time period should be used. To be reasonable, the period must be of sufficient duration to be likely to capture multiple uninsured transactions for each drug in the portfolio of drugs dispensed by the pharmacy during the period. Texas HHS presumes a period between thirty (30) to ninety (90) days would be reasonable. A period only considering uninsured transactions on the same day as the Medicaid claim would not be reasonable, because it would render the frequency determination meaningless. To be reasonable, the period a chain pharmacy uses to calculate the most frequent price at a single pharmacy location in Texas would likely need to be longer than if the chain considered past pricing data across multiple Texas pharmacy locations within the chain.

NACDS construed the updates as radical changes that implemented new rules or amended or clarified existing rules for determining the usual and customary price for reimbursement of drugs dispensed to Medicaid beneficiaries. It contended the updates substantially altered the manner in which pharmacies must report their usual and

8

customary price and should have been subjected to the APA's notice-and-comment period to be effective. HHSC took the position that the updates were not new rules, tracked the language of the 1987 rule, and operated only as guidance or clarification.

HHSC's stance compelled NACDS to seek a declaration regarding the mode for calculating the usual and customary price for reimbursement and an injunction to prohibit enforcement of the updates. NACDS alleged that if HHSC had provided a notice-and-comment period, pharmacy providers could have offered feedback on the unfeasibility of complying with the updates.

The trial court held a hearing on the parties' summary judgment motions. NACDS argued the updates interpreted law and policy, affected the private rights of the regulated entities, and changed the requirements for reporting the usual and customary price for Medicaid reimbursement. It posited the updates made substantial changes, especially to the terms "most frequently charged," "general public," and "same drug." Importantly, NACDS argued the updates redefined "discount." It further argued the updates added a look-back period of between thirty to ninety days for past-pricing data to determine the most frequent price charged and prohibited a same-day determination when the 1987 rule was silent on the issue.

NACDS also contested an addition to the determination of "same drug." The updates added a requirement related to the quantity dispensed to the general public which is not referenced in the 1987 rule.

NACDS challenged inclusion of pharmacy membership programs and third-party discount programs in the determination of the usual and customary price. Most likely,

such programs were unavailable when the 1987 rule became effective but under the updates, pharmacies would be required to have knowledge of myriad discounts in determining the most frequent price. It considered the inclusion of such changes as an amendment to, or interpretation of, the existing rule. According to NACDS, without a notice-and-comment period to seek input from the pharmaceutical industry, the updates left many questions regarding discounts and imposition of a look-back period unanswered.

HHSC argued in support of its motion that the updates did not amend or repeal any requirements for determining the usual and customary price and did not interfere with or impair any rights or privileges of NACDS. HHSC considered the updates "guidelines and information" for pharmacy providers. It argued the inclusion of discounts was not a new requirement in reporting the usual and customary price charged to the general public. It conceded the 1987 rule begins with the most frequent price charged as the baseline but insisted that if a discount is given or advertised, that discount *must* be included in the usual and customary price determination. It further argued that third-party discount programs operate as coupons already contemplated by the 1987 rule.

Regarding the look-back period for past-pricing data, subsection 2.1.1 of the Enrollment Section of the updates acknowledges the 1987 rule is silent on the issue. HHSC, however, disagreed with NACDS that the thirty-to-ninety-day look-back period or the prohibition of same-day transactions for past-pricing data were new requirements. It asserted the look-back period was nonbinding and optional. Finally, HHSC argued that "quantity dispensed" regarding the same drug was not a change that required a notice-and-comment period. HHSC maintained the update requirements were consistent with

10

the 1987 rule and did not amend or repeal any provisions. It also denied the updates interfered with or impaired the legal rights or privileges of NACDS.

Ultimately, the trial court granted HHSC's motion for summary judgment and denied NACDS's motion.

### STANDARD OF REVIEW—COMPETING MOTIONS FOR SUMMARY JUDGMENT

We review a grant of summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316–17 (Tex. 2019). When both sides move for summary judgment, each bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 259 (Tex. 2018). When, as here, the trial court grants one motion for summary judgment and denies the other, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines the trial court erred, renders the judgment the trial court should have rendered. *Seabright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641–42 (Tex. 2015). Neither party can prevail because of the failure of the other to discharge its burden. *Tigner v. First National Bank of Angleton*, 153 Tex. 69, 264 S.W.2d 85, 87 (1954).

When the trial court's order does not specify the grounds for summary judgment, we must affirm the judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). When the trial court's summary judgment does specify a ground upon which it was granted, we generally limit our review to that ground. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625–26 (Tex. 1996).

11

Section 2001.003(6) defines "rule" as follows:

(A)    a state agency statement of general applicability that:

(i)    implements, interprets, or prescribes law or policy; or

(ii)    describes the procedure or practice requirements of a state agency;

(B)    includes the amendment or repeal of a prior rule; and

(C)    does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

§ 2001.003(6).  "General applicability" references "statements that affect the interest of the public at large such that they cannot be given the effect of law without public input." *R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003).  When an agency adopts a rule, it is commanded by the APA to follow numerous requirements. *RWE Renewables Ams.*, *LLC v. PUC of Tex.*, 669 S.W.3d 566, 577 (Tex. App.—Austin 2023, pet. granted Dec. 8, 2023).

When a state agency implements a new "rule," it is subject to a notice-and-comment period under the APA.  *El Paso Hosp. Dist.*, 247 S.W.3d at 715.  Sections 2001.023(a) and (b) provide in part that "[a] state agency shall give at least 30 days' notice of its intention to adopt a rule before it adopts the rule" and shall file notice of the proposed rule with the secretary of state for publication in the *Texas Register.*  Section 2001.024(a)(7) requires inclusion of numerous details in the notice, including "a request for comments on the proposed rule from any interested person."  Section 2001.029(a)

requires three public-comment requirements related to rulemaking: "a reasonable opportunity to submit data, views, or arguments, orally or in writing."

When an agency promulgates a rule without complying with the proper rulemaking procedure, the rule is invalid. TEX. GOV'T CODE ANN. § 2002.035(a); *El Paso Hosp. Dist.*, 247 S.W.3d at 715. An agency must substantially comply with the APA rulemaking requirements and constitute more than a "faint effort or hollow rhetoric." *RWE Renewables Ams., LLC*, 669 S.W.3d at 581.

## ANALYSIS

In our analysis, we apply a de novo review to ascertain and give effect to the Legislature's intent of the relevant statutes. *Odyssey 2020 Acad.*, *Inc. v. Galveston Cent. Appraisal Dist.*, 624 S.W.3d 535, 540 (Tex. 2021). "In doing so, we enforce the plain meaning of statutory text, informed by its context." *Hegar v. Health Care Service Corp.*, 652 S.W.3d 39, 43 (Tex. 2022). We seek to "give effect to all words of a provision and avoid constructions that would render any part of it meaningless." *Odyssey 2020 Acad.*, 624 S.W.3d at 540.

Since 1987, the baseline for reporting the usual and customary charge is what a pharmacy provider "most frequently charges" the "general public" for the "same drug." There is, however, disagreement on the meaning of those terms. Also contested is how to factor discounts in determining the usual and customary price for Medicaid reimbursement.

Circa 2006, the pharmacy industry began to change. Wal-Mart began offering generic drugs to cash-paying customers for $4 and submitted the discount price as its

usual and customary price for Medicaid reimbursement. Other pharmacies also began to offer discounted prices or provide membership plans free or for a nominal fee for lower drug prices but did not report those prices as the usual and customary price. HHSC alleged that not reporting the discounted prices was an attempt by pharmacies to use Medicaid reimbursements to compensate for lost profits resulting from discounts. Such a practice prompted HHSC to serve notice on pharmacy providers via its 2008 *RxUpdate* publication that discounted prices should be submitted as the usual and customary price for Medicaid claims. It warned pharmacies to enroll all of its Medicaid beneficiaries in any discount membership plans which it contends NACDS members refused to do.

After the 2008 *RxUpdate* publication, various enforcement actions were filed against certain pharmacies for using discount membership plans to provide discounts to the general public without reporting those discounts to Medicaid as the usual and customary price. The suits were eventually settled. Those settlements do not mention third-party discounts or reflect a change in the method for reporting the usual and customary price.

At the core of the underlying dispute is whether the 2020 updates constitute new rules or are merely clarifications to the 1987 rule. HHSC does not dispute that it did not provide a notice-and-comment period for the updates. Its position, however, is based on its argument that the updates are simply restatements of standards which have been applied for years and do not require compliance with the APA.

Central to the dispute is the treatment of discounts. HHSC alleges that pharmacies became creative at evading the 1987 rule requirement for reporting discounts by

14

introducing third-party discount and membership plans to customers but excluding those discounts from the usual and customary price submitted for Medicaid reimbursement.

According to NACDS, the updates purport to require pharmacies to automatically submit a discount price as the usual and customary price if it is advertised unless the most frequently charged price is lower. The 1987 rule requires pharmacies to incorporate an advertised discount *if* the Medicaid beneficiary would qualify as a member of the same segment of the general public to whom the discount is available. The updates also purport to require pharmacies to automatically submit a membership program price as the usual and customary price unless the price would be greater than the most frequently charged price for the same drug. The 1987 rule does not reference membership program prices as discounts and only requires inclusion of a discount *if* the Medicaid beneficiary would qualify as a member of the same segment of the general public who could receive the price. The requirement for automatic submission of discount prices is a significant change from submission of advertised discounts.

The updates also redefine "discount." Relying on *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), HHSC now includes pharmacy discount membership programs that are given or advertised to the general public and third-party discount program prices offered, advertised, or adjudicated to the general public. The updates mandate those program prices be submitted as the usual and customary price for Medicaid reimbursement unless the price would be greater than the most frequently

15

charged price for the same drug. The plain meaning of "discount" does not capture the savings offered under membership program prices and third-party discount programs.[7]

Subsections 5.4 and 5.5 of the Enrollment Section of the updates added that customers who pay a nominal fee to enroll in pharmacy membership programs or third-party discount programs are not excluded from the general public. Thus, under the updates, discounts from such programs must be included in the determination of the usual and customary price.

Subsection (c) of the 1987 rule conditions inclusion of *all* discounts given or advertised in determining the usual and customary price *only* when the pharmacy fails to keep adequate records required by the rule. Yet the updates mandate inclusion of all discounts which would render subsection (c) superfluous and meaningless. We must avoid construing a portion of a statute as surplusage. *Jim Olive Photography v. Univ. of Houston Sys.*, 624 S.W.3d 764, 780 n.9 (Tex. 2021).

A significant addition to the 1987 rule is the requirement of a look-back period to calculate the most frequent price for the same drug. Subsection 2.1.1 of the Payment Section acknowledges the 1987 rule is *silent* on any look-back periods. Nevertheless, the updates include a thirty-to-ninety-day look-back period as "reasonable" for considering past-pricing data to arrive at the most frequently charged price. And the updates prohibit consideration of same-day uninsured transactions as unreasonable. The

---

[7] "Discount" means "a reduction made from the gross; a reduction made from a regular price. *www.merriam-webster.com/dictionary/discount* (last visited June 12, 2024). Additionally, pharmacy memberships programs and third-party discount programs create their own price lists and structures and are only available to those who take affirmative action to participate in those programs and be bound by their terms and conditions.

1987 rule does not contain any requirement on the use of a "reasonable time period" for determining the most frequently charged price. Thus, addition of a look-back period and prohibition of same-day transactions amends the 1987 rule.

Finally, the 1987 rule does not contain a requirement for calculation of "same drug." However, section 2.1.1 of the Payment Section includes the method for determining the usual and customary price on a *per unit basis* of the *same drug* regardless of the quantity sold.

HHSC posits the updates were drafted simply to "clarify" what the 1987 rule already provided. Relying on *Brinkley v. Tex. Lottery Comm'n*, 986 S.W.2d 764, 769 (Tex. App.—Austin 1999, no pet.), HHSC contends agencies routinely issue letters and other documentation which have not been construed as "rules" under the APA definition. *Brinkley* is distinguishable. In *Brinkley*, the plaintiff sued for declaratory relief to determine whether "eight-liners were "gambling devices" under the Texas Penal Code. *Id*. at 766. After numerous complaints from licensees who operate bingo parlors, the Commission issued letters setting forth criteria for ascertaining the legal status of their machines. *Id.* at 767. The plaintiff, however, did not hold a license to operate a bingo parlor but did own several eight-liners he operated in a space leased in a licensed bingo parlor. The licensee of the parlor refused to allow the plaintiff to continue operating his eight-liners. *Id.* In concluding the letters were not rules under the APA, the court explained the letters were statements regarding the internal management or organization which did not affect private rights or procedures and the plaintiff was not "an affected person." *Id.* at 770.

17

In the underlying case, the pharmacies which are contractually obligated to HHSC under their Agreements are affected entities. The updates are statements of general applicability that affect the interest of the public at large such that they cannot be given the effect of law without public input. Unlike in *Brinkley*, the updates do not include statements regarding only the internal management or organization of a state agency which do not affect private rights or procedures. Instead, the updates alter the 1987 rule. They do not track the language of the statute as HHSC contends but rather interpret provisions or add or eliminate text to certain provisions.

HHSC also relies on *Tex. Bd. of Pharm. v. Witcher*, 447 S.W.3d 520, 529 (Tex. App.—Austin 2014, pet. denied), and *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994), to support its argument that the look-back period falls outside of the definition of "rule" because it is nonbinding and optional. It claims a reasonable look-back period is merely a recommendation and not sufficient to establish a rule. But the look-back period is not written in nonbinding or optional language. Nor is the prohibition against same-day transactions. A contracting pharmacy's failure to use the look-back period could subject it to a fraud claim for non-compliance with those provisions and should have been subjected to a notice-and-comment period.

Comparing the language of the 1987 rule with the complained-of updates does not require an evaluation of extrinsic evidence to conclude that, at a minimum, HHSC's updates interpret, add, or remove language from the 1987 rule.[8] *EATX Coffee, LLC v.*

---

[8] Some extrinsic evidence supporting NACDS's position includes a 2008 email from an HHSC executive who commented as follows regarding discount membership programs:

> Do either CVS or Albertsons charge for enrollment into their program? I remember that was the issue with Walgreens. They charge approx. $30 to be enrolled in the program and

*Tex. Alcoholic Bev. Comm'n*, No. 04-16-00213-CV, 2016 Tex. App. LEXIS 12938, at *10 (Tex. App.—San Antonio Dec. 7, 2016, pet. dism'd) (mem. op.) (noting that definition of "rule" not only includes amend or repeal, but also interpretive statements).

The updates purport to alter the method for calculating the usual and customary price for submitting a Medicaid reimbursement claim. Per their Agreements, pharmacy providers are contractually obligated to comply with the updates. As written, they expose pharmacies to liability for fraud for submitting claims which do not comply with the proposed method for determining the usual and customary price.

The updates are statements of general applicability which fall under the definition of "rule" and thus, required a notice-and-comment period. We hold the 2020 updates

---

patients also get other benefits (I think). This model was trickier, re: whether we can direct them to enroll Medicaid clients. I think the jury (legal opinion?) is still out about our authority for the plans that use this model.

Another email in 2009 from an HHSC Pharmacy Policy Analyst provided as follows:

We don't define "Usual and customary" in the state plan other that [sic] to say the usual price charged to the general public. We are getting the $4.00 generic prices from Walmart and the $5.00 generic prices from HEB, but we are not getting the Walgreens generic price deals because they say you have to "buy" one of their card [sic], etc. And I think there are a couple of others like that. Our attorney's [sic] have looked at it and don't think we can do anything about it.

A chart regarding HHSC Medicaid and CHIP Cost Containment provided as follows under the heading "Policy Change":

Require Pharmacies that offer low cost generic incentive programs to automatically enroll Medicaid clients into this program.

Under the "Potential Issues/Notes" column of the chart, a note was included providing a "[s]tatutory change may be required to implement this option."

The referenced evidence indicates HHSC did not consider membership programs or third-party discount programs as the types of "discounts" contemplated by the 1987 rule. It demonstrates HHSC's concern on how to handle certain discounts and supports NACDS's argument that the updates did not merely clarify the 1987 rule but significantly changed the method for determining the usual and customary price.

19

constitute rules which required HHSC to comply with the APA's rulemaking requirements and its failure to do so results in those updates being rendered invalid.

HHSC does not dispute that Young did not comply with her ministerial duties; however, because this Court now holds the updates are rules, as Executive Commissioner, she was required to consult with an advisory panel composed of an equal number of physicians, pharmacists, and pharmacologists appointed by her before adopting rules for the state prescription drug program. *See* TEX. GOV'T CODE ANN. § 531.302(c). By failing to comply with her ministerial duties, Young acted *ultra vires*. Issues one and two are sustained.

## CONCLUSION

The trial court's summary judgment in favor of Cecile Young, in her official capacity as the Executive Commissioner of the Texas Health and Human Services Commission, and the Texas Health and Human Services Commission is reversed. Judgment is rendered declaring the May 2020 online updates to subsections 2.1 and 2.1.1 of the Payment Section and subsections 5.4 and 5.5 of the Enrollment Section of the Texas Vendor Drug Program Pharmacy Provider Procedural Manual constitute rules and are invalid and of no effect.

Alex Yarbrough
Justice

20